**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
ARROWOOD SURPLUS LINES       :
INSURANCE COMPANY formerly   :
known as ROYAL SURPLUS LINES :
INSURANCE COMPANY as         :
successor in interest to     :
CONNECTICUT SPECIALTY        :
INSURANCE COMPANY,           :
                             :
      Plaintiff,             :
                             :
v.                           :   Civil No. 3:08CV01393(AWT)
                             :
WESTPORT INSURANCE           :
CORPORATION formerly known   :
as EMPLOYERS REINSURANCE     :
CORPORATION,                 :
                             :
      Defendant.             :
                             :
-----------------------------x
```

<u>**RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS**</u>

The plaintiff, Arrowood Surplus Lines Insurance Company ("Arrowood"), filed this diversity action against Westport Insurance Corporation alleging breach of contract. The defendant has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the defendant's motion is being granted.

**I.   Factual Background**

For purposes of a motion for judgment on the pleadings, the court accepts as true the facts alleged in the complaint.  The plaintiff, Arrowood, was formerly known as Royal Surplus Lines Insurance Company ("Royal Surplus").  Royal Surplus entered into a

Reinsurance, Assignment and Assumption agreement with Connecticut Specialty Insurance Company ("Connecticut Specialty"), pursuant to which Royal Surplus assumed the liabilities and acquired the related assets of Connecticut Specialty's covered business as of December 31, 2001.  Employers Reinsurance Company ("Employers Reinsurance"), a reinsurance company organized under the laws of Missouri, was merged into Westport Insurance Corporation, effective January 1, 2008, with Westport Insurance Corporation ("Westport") being the surviving corporation.

In 1999, Connecticut Specialty and Employers Reinsurance entered into a Liability Reinsurance Agreement, effective February 1, 1999 (the "Reinsurance Agreement").  Pursuant to the Reinsurance Agreement, the defendant reinsured, inter alia, a class of insurance policies in a package under which Connecticut Specialty had assumed the risk.  Included in this package was a one-year general liability policy issued by Connecticut Specialty to Equity Residential ("Equity"), a real estate investment trust that owned and managed apartment complexes (the "Equity Policy").  The Equity Policy went into effect on December 15, 1999.  On May 16, 2000, Employers Reinsurance terminated the Reinsurance Agreement effective August 18, 2000.

In 2004, Equity filed a complaint in the United States District Court for the Northern District of Illinois against a number of individuals and entities setting forth claims for RICO, breach of fiduciary duty, fraud, and conspiracy arising out of

2

Equity's purchase of insurance from Connecticut Specialty. Subsequently, in its Fourth Amended Complaint, Equity asserted claims for a declaratory judgment, breach of contract, and reformation of contract against Royal Surplus for losses that occurred between December 15, 2000 and December 15, 2002.  On December 27, 2007, Arrowood paid Equity the sum of $4,100,000 to settle those claims.  Additionally, Arrowood has incurred $2,609,325.55 in claim expense.

The parties agree that Arrowood had reinsurance coverage under the Equity Policy for losses occurring from December 15, 1999 to December 15, 2000.[1]  In this action, Arrowood seeks reimbursement for the settlement payment to Equity and claim expense in connection with losses occurring between December 15, 2000 and December 15, 2002.  Arrowood claims that its settlement with Equity was based on the risk that the court would modify, alter, or interpret the Equity Policy to provide an additional two years of coverage to Equity.  Westport takes the position that it is only liable to indemnify Arrowood for losses occurring in the first year of the Equity Policy and has no liability for losses occurring after December 15, 2000.

---

[1] Although the effective date of the Reinsurance Agreement's termination was August 18, 2000, Article XVIII of the Reinsurance Agreement (the "Runoff Option") provides that "[t]he REINSURED may elect to continue the application of this agreement to loss under policies becoming effective prior to the termination date of this agreement . . . ."  The parties agree that Arrowood exercised the Runoff Option.

II.  **Legal Standard**

When considering a Rule 12(c) motion for judgment on the pleadings, the court uses the same standard as that used to address a Rule 12(b)(6) motion to dismiss for failure to state a claim. <u>Johnson v. Rowley</u>, 569 F.3d 40,43 (2d Cir. 2009); <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 521 (2d Cir. 2006).  Under both rules, the court "will accept all factual allegations in the complaint as true and draw all reasonable inferences" in favor of the non-moving party. <u>Johnson</u>, 569 F.3d at 43; <u>Burnette v. Carothers</u>, 192 F.3d 52, 56 (2d Cir. 1999).  To survive a Rule 12(c) motion, the "'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" <u>Johnson</u>, 569 F.3d at 44 (quoting <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted)).

In a diversity case, the court applies the substantive law of the forum state, in this instance Connecticut. <u>Omega Eng'g, Inc. v. Omega, S.A.</u>, 432 F.3d 437, 443 (2d Cir. 2005).  Under Connecticut law, the interpretation of an insurance policy is a question of law for the court. <u>Pac. Indem. Ins. Co. v. Aetna Cas. & Sur. Co.</u>, 688 A.2d 319, 321 (Conn. 1997) *(*citing <u>Hansen v. Ohio Cas. Ins. Co.</u>, 687 A.2d 1262, 1265 (Conn. 1996)).  "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." <u>Hansen</u>, 687 A.2d at 1265.  Indeed, insurance policies

4

are "interpreted by the same general rules that govern the
construction of any written contract and enforced in accordance
with the real intent of the parties as expressed in the language
employed in the policy.  The policy words must be accorded their
natural and ordinary meaning." Id. at 1264 (internal quotation
marks and citations omitted).

## III. Discussion

Arrowood argues that the settlement of the Equity litigation
was covered under the Reinsurance Agreement because, under Article
IV of the Reinsurance Agreement, i.e. the "follow the fortunes"
clause, the settlement constituted a modification of the
Reinsurance Agreement.

The "follow the fortunes" doctrine, also known as the "follow
the settlements" doctrine in the context of settlements, Travelers
Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am., 419 F.3d
181, 186 n.4 (2d Cir. 2005), is a principle of reinsurance law that

> binds a reinsurer to accept the cedent's good
> faith decisions on all things concerning the
> underlying insurance terms and claims against
> the underlying insured: coverage, tactics,
> lawsuits, compromise, resistance or
> capitulation. This doctrine insulates a
> reinsured's liability determinations from
> challenge by a reinsurer unless they are
> fraudulent, in bad faith, or the payments are
> clearly beyond the scope of the original
> policy or in excess of [the reinsurer's]
> agreed-to exposure.  Basically, the doctrine
> burdens the reinsurer with those risks which
> the direct insurer bears under the direct
> insurer's policy covering the original
> insured.

N. River Ins. Co. v. Ace Am. Reins. Co., 361 F.3d 134, 139-40 (2d

Cir. 2004) (alteration in original) (internal quotation marks and citations omitted).

However, the "follow the fortunes" doctrine only applies to losses that the reinsurer agreed to cover.  As the Second Circuit has noted, "[i]t is well-established and not at all surprising that follow-the-fortunes does not require indemnification for losses not covered by the underlying policies." Travelers, 419 F.3d at 193; N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1206-07 (3d Cir. 1995) ("The protection for the reinsurer [under the 'follow the fortunes' doctrine] is based on contractual intent: a reinsurer cannot be held liable for a kind of loss that it did not agree to cover.").  "[W]hile a 'follow the fortunes' clause limits a reinsurer's defenses, it does not make a reinsurer liable for risks beyond what was agreed upon in the reinsurance certificate." Id. at 1199. The reinsurer is bound to accept the good faith settlements of the reinsured, but not for a class of losses it had not agreed to cover in the first place.

In this case, the losses under the Equity Policy are outside the Reinsurance Agreement.  Article I of the Reinsurance Agreement limits the agreement's scope to "policies. . . becoming effective on or after the effective date of this agreement as a result of occurrences taking place prior to the termination date of this agreement," subject to reinsured's right to maintain coverage on existing policies for a limited time after termination of the Reinsurance Agreement pursuant to the Runoff Option.  Article I

6

continues, providing that a "policy issued for a policy period of more than one year shall be considered as 'becoming effective' at each anniversary date of such policy while such policy is in force."

This clause limits the coverage period for any reinsurance provided to a year at a time, regardless of the length of the underlying insurance contract. At the end of one year, if the Reinsurance Agreement has not been terminated, a new year of reinsurance coverage will become effective. If, however, the Reinsurance Agreement has been terminated in the interim, reinsurance coverage ceases on the termination date unless the exercise of the Runoff Option keeps it in effect until the anniversary of the underlying policy. For example, reinsurance on a three-year insurance policy issued on January 1, 2000 would last until December 31, 2000. On January 1, 2001, if the reinsurance agreement remained in effect, that policy would be reinsured for another year, until December 31, 2001. Were the reinsurance contract terminated in the interim, however, the underlying policy would continue without reinsurance coverage, beginning on either the effective date of termination or, if the Runoff Option were exercised, on January 1, 2001.

Arrowood argues that the "follow the fortunes" clause of Article IV changes the outcome here. Article IV provides that "[a]ll reinsurance under this agreement shall be subject to. . . the same modifications, alterations and interpretations as the

7

respective policies of the REINSURED [Arrowood], and the liability
of the CORPORATION [Westport] shall follow that of the REINSURED in
every case."  Arrowood claims its settlement with Equity was based
on the risk that the court hearing Equity's claims against it would
"modify" the policies Arrowood issued to be three-year policies
rather than the one-year policy Arrowood claims that it issued.

However, Article IV of the Reinsurance Agreement, the "follow
the fortunes" clause, by its terms applies only to reinsurance
"under this agreement."  Consequently, whether or not a court so
"modified" the Equity Policy and whether or not the Equity Policy
was initially a three-year policy or a one-year policy, it would
still be governed by the same provisions as every other policy
reinsured under the Reinsurance Agreement.  A three-year policy,
whether written as such or modified, is still subject to the
"becoming effective" provision in Article I, which defines the
scope of the Reinsurance Agreement.  See Bellefonte Reins. Co. v.
Aetna Cas. & Sur. Co., 903 F.2d 910, 913 (2d Cir. 1990)
("[A]llowing the 'follow the fortunes' clause to override the
limitation on liability[ ]would strip the . . . limitation . . . of
. . . meaning; the reinsurer would be obliged merely to reimburse
the insurer for any . . . funds paid. [This] would be contrary to
the parties' express agreement and to the settled law of contract
interpretation.").  In this case, the initial date of the Equity
Policy was December 15, 1999, so it "became effective" on that
date, establishing reinsurance coverage until the Equity Policy's

8

next anniversary date, December 15, 2000.   Because Westport

terminated the Reinsurance Agreement on August 18, 2000, before the

Equity Policy's anniversary date of December 15, 2000, only the

first year of the Equity Policy would be covered by the Reinsurance

Agreement after exercise of the Runoff Option.   Losses after that

date would not be covered by the Reinsurance Agreement, because the

Equity Policy could not have "become effective" under a reinsurance

agreement that had been terminated and was no longer "in force."

As a result, all losses occurring after the Equity Policy's

anniversary date, December 15, 2000, were not reinsured, and

Westport is not liable to Arrowood for those losses.   Because

Westport has not breached its contract with Arrowood, Arrowood is

not entitled to relief.   Therefore, the defendant's motion for

judgment on the pleadings should be granted.

**IV.   <u>Conclusion</u>**

     For the reasons set forth above, Westport Insurance

Corporation's FRCP 12(c) Motion for Judgment on the Pleadings (Doc.

No. 23) is hereby GRANTED.

     The Clerk shall enter judgment in favor of the defendant and

close this case.

     It is so ordered.

     Dated this 5th day of January, 2010, at Hartford, Connecticut.


                         /s/AWT
                    Alvin W. Thompson
                 United States District Judge

9